**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

ROKIT WORLD, INC.

        Plaintiff

      v.

WILLIAMS GRAND PRIX
ENGINEERING LIMITED
Grove, Wantage, Oxfordshire,
OX12 0DQ

And

CLAIRE WILLIAMS
30 Finsbury Square,
London,
EC2A 1AG

And

MICHAEL O'DRISCOLL
30 Finsbury Square,
London,
EC2A 1AG

And

DOUG LAFFERTY
Aston Martin
Banbury Road
Gaydon,
Warwick,
CV35 0DB

        Defendants.

**Case No:**

**COMPLAINT**

1

Plaintiff ROKIT WORLD, INC.. ("RWI")) hereby brings suit against Defendants WILLIAMS GRAND PRIX ENGINEERING LIMITED ("Williams Engineering"), CLAIRE WILLIAMS ("Ms. Williams"), MICHAEL O'DRISCOLL ("Mr. O'Driscoll") and DOUG LAFFERTY ("Mr. Lafferty") for fraud and to set aside the arbitration award in *Williams Grand Prix Engineering Limited v. Rokit Marketing Inc. and Rok Marketing LLC*, LCIA Case No. 204960 (the "Arbitration Award") which award was confirmed by the U.S. District Court for the Central District of California on December 1, 2022 in *Williams Grand Prix Engineering Limited v. Rokit Marketing Inc. and Rok Marketing LLC*, 2:21-cv-09695-CAS-PD (C.D. Cal.).

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this case pursuant to both 28 U.S.C. § 1331 and 28 U.S.C § 1332 as there is a federal question and the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000

2. Venue is proper pursuant to 28 U.S.C. § 1391 in that this is a district in which a substantial part of the events or omissions giving rise to Plaintiff's claim occurred.

## THE PARTIES

3. RWI is a corporation incorporated under the laws of Delaware. It is the parent company of Able Events, Inc. ("Able"), which was formerly known as ROKiT Marketing, Inc. ("RMI") and Combine Enterprises LLC ("Combine") which was formerly known as ROK Marketing LLC ("ROK Marketing"). RWI does substantial business in this judicial district and has its physical locations in this judicial district.

4. Williams Engineering is a private limited company incorporated in England and Wales. Its primary place of business is in England. Williams Engineering does substantial and continued business in Florida and on information and belief in this judicial district, as one of its

two drivers, Logan Sargeant, is a citizen of Florida. Furthermore, William Engineering has competed in the Miami Grand Prix every single year between 2022 and 2024 as well, a major Formula One ("F1") competition.

5.     Ms. Williams is an individual and a citizen and resident of the United Kingdom. She was until September 3, 2020 a director of Williams Engineering.

6.     Mr. O'Driscoll is an individual and a citizen and resident of the United Kingdom. He was until August 21, 2020 a director of Williams Engineering.

7.     Mr. Lafferty an individual and a citizen and resident of the United Kingdom. He was until August 21, 2020  a director of Williams Engineering.

## STANDING

8.     Plaintiff has standing to bring claims because they have been directly and proximately harmed by the fraudulent statements of the Defendants set forth herein, which fraudulently caused its subsidiaries Able Events and Combine to enter into sponsorship agreements with Williams Engineering where Plaintiff's "ROKiT" logo was to be displayed by Williams Engineering.

9.     As a direct and proximate result of the fraudulent representations made by the Defendants, Plaintiff has suffered significant financial loss and damage to its goodwill and business reputation.

## FACTS
### *Background Facts*

10.     Plaintiff RWI is an authorized licensee and user of the "ROKiT" logo.

11.     In the public's view, the "ROKiT" logo represents Plaintiff RWI, and any harm flowing from the misconduct of the Defendants as alleged herein is therefore felt by Plaintiff

RWI and not its subsidiaries, Able Events and Combine, which Plaintiff RWI has allowed to use to "ROKiT" logo.

12.     Able Events entered into a 3-year Title Sponsorship Agreement with Williams Engineering on January 26, 2019 for the 2019 Formula One Season onwards to the present.

13.     Under the terms of this Sponsorship Agreement, Williams agreed to prominently display Plaintiff RWI's "ROKiT" logo on its cars, driver helmets, mechanic helmets, driver overalls, mechanic overalls, team kit, merchandise kit, and team environment.

14.     In 2019 Able Events made payments in the total amount of $17,644,482 to Williams Engineering pursuant to the terms of the Title Sponsorship Agreement.

15.     The Title Sponsorship Agreement was subsequently extended by an amendment on July 10, 2019, by 2 years. Able Events would pay £13,500,000.00 per annum to Williams Engineering. The obligations that Williams Engineering is obligated to perform, in accordance with the contract are in clauses 4.1 to 4.8 of the contract and are as follows:

> 4.1     Williams shall operate the Team and enter the same in the Championship for each year or part thereof for which this Agreement is effective. The Team shall participate in each Race of each such Championship, provided that Williams reserves the right to withdraw (without penalty hereunder, save that for the avoidance of doubt clause 8.2 shall still apply) from any Race where it has reasonable concerns related to the safety or conditions of such Race, and its non-participation is affected in common with at least one (1) other team entered in the Championship (which was a team finishing in the top six (6) places of the Championship for Constructors during the preceding Season) or for compassionate grounds.

> 4.2     Subject to clause 4.1, Williams shall enter two Cars in all Races and maintain such levels of engineers, equipment, spare parts, fuel, lubricants, tyres, and staff as Williams in its absolute discretion considers necessary to ensure that both Cars are presented in the highest condition and qualify for entry to the Race.

> 4.3     During the Term the Team shall conduct itself at all times in a manner appropriate to a professional racing team and do nothing to damage the reputation or goodwill of the Sponsor or any product of the Sponsor or to bring the same into material disrepute.

4.4     Notwithstanding the specific undertakings contained in this Agreement, during the Term Williams shall, so far as is reasonably practicable and appropriate, acknowledge the support of the Sponsor, whether singly or in common with other Team Partners, and seek generally to enhance the image and reputation of the Sponsor in its dealings with the media.

4.5     Williams shall nominate a representative (who at all times shall, as between the Sponsor and Williams be an employee of Williams), for the purposes of liaising with the representative of the Sponsor nominated in accordance with clause 3.5.

4.6     During the Term Williams shall, subject to the Rules, provide the marketing and promotional services to the Sponsor as set out in Schedule 2. Williams undertakes that it has not granted, and will not at any time during the Term grant, to any person, any rights or benefits similar to or the same as those granted to the Sponsor in this Agreement for exploitation in the categories detailed in the Sponsor's Business (or any or all of them). Williams hereby confirms that the Drivers have not entered into, and will procure (by way of an applicable provision in the agreement between Williams and the Driver) that the Drivers will not at any time during the Term enter into, any sponsorship or endorsement agreement or arrangement with any person for exploitation in the categories detailed in the Sponsor's Business (or any or all of them).  For the avoidance of doubt, nothing in this clause 4.6 will prevent Williams from entering into a sponsorship agreement with a provider of a mobile network operator where such sponsorship agreement includes the provision of business services to Williams in respect of its operation as a Team in the Championship.

4.7     Williams acknowledges that all intellectual property rights (including, without limitation, trade mark rights, copyright and registered design rights) in respect of the Sponsor Group's and Sponsor's name, logo, trade marks and all other proprietary material of the Sponsor Group and Sponsor shall remain both during the Term and thereafter the property of the Sponsor or applicable member of the Sponsor Group.  Williams further acknowledges that this Agreement does not operate to vest any right, title or interest to or in such Sponsor trade marks or proprietary material.

4.8     Williams hereby represents and warrants that the use by the Sponsor of: (a) the Williams' trade marks; (b) other proprietary material of Williams detailed hereunder; and (c) the marketing and promotional services provided by Williams as set out in Schedule 2; in accordance with the terms hereof:
(i)      in each territory in which a Race is held as at the date hereof;
(ii) in the United Kingdom;
(iii) in any territory within the European Union; and/or

(iv) to the best of Williams' knowledge, other than as set out in sub-clauses (i), (ii) and (iii) above (but, for the avoidance of doubt, in accordance with this Agreement), shall not infringe the rights of any third party.

16.    Combine entered into a 4-year Drinks Sponsorship Agreement with Williams Engineering on October 22, 2019, for the 2020 Formula One Season onwards to the present.

17.    Under the terms of this Sponsorship Agreement, Williams agreed to prominently display Plaintiff RWI's "ROKiT" logo on its cars, driver helmets, driver caps, driver overalls, mechanic overalls, team kit, merchandise kit, and team environment, along with the logos from Plaintiff's alcoholic drinks, Bogart's, ABK, and/or Bandero, or ROKiT Smart Cities and/or ROKiT Phones.

18.    The obligations that Williams Engineering is obligated to perform, in accordance with the contract are in clauses 4.1 to 4.8 of the contract and are as follows:

4.1    Williams shall operate the Team and enter the same in the Championship for each year or part thereof for which this Agreement is effective. The Team shall participate in each Race of each such Championship, provided that Williams reserves the right to withdraw (without penalty hereunder, save that for the avoidance of doubt clause 8.2 shall still apply) from any Race where it has reasonable concerns related to the safety or conditions of such Race, and its non-participation is affected in common with at least one (1) other team entered in the Championship (which was a team finishing in the top six (6) places of the Championship for Constructors during the preceding Season) or for compassionate grounds.

4.2    Subject to clause 4.1, Williams shall enter two Cars in all Races and maintain such levels of engineers, equipment, spare parts, fuel, lubricants, tyres, and staff as Williams in its absolute discretion considers necessary to ensure that both Cars are presented in the highest condition and qualify for entry to the Race.

4.3    During the Term the Team shall conduct itself at all times in a manner appropriate to a professional racing team and do nothing to damage the reputation or goodwill of the Sponsor or any product of the Sponsor or to bring the same into material disrepute.

4.4    Notwithstanding the specific undertakings contained in this Agreement, during the Term Williams shall, so far as is reasonably practicable and appropriate, acknowledge the support of the Sponsor, whether singly or in

common with other Team Partners, and seek generally to enhance the image and reputation of the Sponsor in its dealings with the media.

4.5     Williams shall nominate a representative (who at all times shall, as between the Sponsor and Williams be an employee of Williams), for the purposes of liaising with the representative of the Sponsor nominated in accordance with clause 3.5.

4.6     During the Term Williams shall, subject to the Rules, provide the marketing and promotional services to the Sponsor as set out in Schedule 2. Williams undertakes that it has not granted, and will not at any time during the Term grant, to any person, any rights or benefits similar to or the same as those granted to the Sponsor in this Agreement for exploitation in the categories detailed in the Sponsor's Business (or any or all of them). Williams hereby confirms that the Race Drivers have not entered into, and will procure (by way of an applicable provision in the agreement between Williams and the Race Driver) that the Race Drivers will not at any time during the Term enter into, any sponsorship or endorsement agreement or arrangement with any person for exploitation in the categories detailed in the Sponsor's Business (or any or all of them).  For the avoidance of doubt, nothing in this clause 4.6 will prevent Williams from entering into a sponsorship agreement with a provider of a mobile network operator where such sponsorship agreement includes the provision of business services to Williams in respect of its operation as a Team in the Championship.

4.7     Williams acknowledges that all intellectual property rights (including, without limitation, trademark rights, copyright and registered design rights) in respect of the Sponsor Group and Sponsor's name, Sponsor's Logo, trademarks and all other proprietary material of the Sponsor Group and Sponsor shall remain both during the Term and thereafter the property of the Sponsor or applicable member of the Sponsor Group.  Williams further acknowledges that this Agreement does not operate to vest any right, title or interest to or in such Sponsor trademarks or proprietary material save for the rights granted to Williams pursuant to this Agreement.

4.8     Williams hereby represents and warrants that the use by the Sponsor of: (a) the Williams' trademarks; (b) other proprietary material of Williams detailed hereunder; and (c) the marketing and promotional services provided by Williams as set out in Schedule 2; in accordance with the terms hereof:
(i)      in each territory in which a Race is held as at the date hereof;
(ii) in the United Kingdom;
(iii) in any territory within the European Union; and/or
(iv) to the best of Williams' knowledge, other than as set out in sub-clauses (i), (ii) and (iii) above (but, for the avoidance of doubt, in accordance with this Agreement), shall not infringe the rights of any third party.

19.     These two agreements are hereafter referred to as the "Sponsorship Agreements."

20.     In March of 2020, as a result of COVID-19, Formula One ("F1") postponed the 2020 racing season until further notice. Specifically, on or around March 12, 2020, it was announced that the Australian Grand Prix, which was scheduled for March 13-15, 2020, would not commence, due to COVID-19 regulations, and after that, a number of the races were postponed or cancelled, including the Miami Grand Prix, which would have been held in Florida. The 2020 Formula One Season was compromised due to COVID-19 regulations.

21.     Furthermore, on or around October 14, 2019, Defendants were informed that the color scheme of the F1 car was a breach of clause 3.8 of the Sponsorship Agreements between the parties. The color scheme was eventually corrected, but the signage was still not right and not the right size. This governing provision of the Sponsorship Agreements stated:

> **[ROKiT Marketing Inc.] ABLE EVENTS Title Sponsorship -** The Sponsor acknowledges that Williams shall at all times have full responsibility for and control of the Team and of its participation in any Race or other activity undertaken by the Team and that Williams shall exclusively determine all matters in relation thereto. Williams acknowledges and agrees that the colour scheme applied to Cars used in Races and tests from the 2020 Championship Season onwards shall be mutually agreed in good faith. Further, the Sponsor acknowledges and agrees that such colour scheme needs to be decided and agreed expeditiously following Williams' request during the preceding Seasons (as applicable) and, as such, the Sponsor agrees that its agreement in respect of such colour scheme shall not be unreasonably withheld, delayed or conditioned.

> **[ROK Marketing, LLC] RML Drinks Sponsorship -** The Sponsor acknowledges that Williams shall at all times have full responsibility for and control of the Team and of its participation in any Race or other activity undertaken by the Team and that Williams shall exclusively determine all matters in relation thereto. Williams acknowledges and agrees that the color scheme applied to Cars used in Races and tests from the 2020 Championship Season onwards shall be mutually agreed in good faith by the parties and that the color scheme shall not be changed (whether for the 2020 Championship Season from the color scheme applied to Cars used in Races and tests in the 2019 Championship Season or from the color scheme applied to Cars used in Races and tests in subsequent Championship Seasons as agreed by the parties) without the prior written approval of the Sponsor.

22.     Defendants refused to remedy this breach of clause 3.8 of the Sponsorship Agreements and never used the correct size of the Sponsor's logos.

23.     Then, on or around April 6, 2020 it was announced that Williams Engineering was furloughing some of its staff and that senior management and drivers would have a pay cut of 20% effective from April 1st 2020 as a result of the Formula One season being compromised due to COVID-19 regulations, a clear sign that Williams Engineering was in dire financial straits.

24.     Not coincidentally, on or around April 7, 2020, Defendants wrote to Able Events and COmbine and alleged that they had breached both Sponsorship Agreements due to non-payment of the first and second installments, as well as, in relation to Able Events, a "bonus" payment of $1,000,000.00 USD. Williams intentionally damaged Plaintiff's reputation by disclosing the non-payment to the media before even informing the Plaintiff. This was done intentionally to cause Plaintiff as much damages as possible, reputational and otherwise.

25.     In response, Able Events wrote:

"The first instalment of the Fee in 2020 covers the period from 1st January 2020 to 14th May 2020 (inclusive). From the date of cancellation of the Australian Grand Prix ROKiT has not received the majority of rights under the Agreement and with the cancellation of the Monaco Grand Prix, suspension of numerous further races and the virtual certainty that additional races will be suspended or cancelled in 2020 (if the Season even goes ahead) ROKiT will not receive the majority of rights under the Agreement in 2020. We find it surprising that we have received no correspondence or proposals from Williams in relation to lost rights as a result of the impact of Covid 19 on Formula One, just a claim for payment and threats in relation thereto. That being said, we are willing to make payment of the first instalment of the Fee in 2020 by 15th May 2020 without prejudice to our rights and remedies under the Agreement and in law. We look forward to your proposals to compensate us for the loss of rights to date under the Agreement and moving forward as a matter of urgency.

Mr. Kendrick personally proposed a gift of $1m to Williams and finds it distasteful that you are now seeking to claim that non-payment constitutes a

breach of the Agreement. Mr. Kendrick will make the payment of $1,000,000 personally to Williams by 15th May 2020 provided that you confirm that the invoice issued by Williams in relation thereto will be cancelled forthwith and that Williams irrevocably waives any claims it may have in relations to the said $1,000,000 and undertakes not to make any claim against ROKiT or any of its affiliates in relation to the said $1,000,000.

The second instalment of the Fee in 2020 covers the period from 15th May 2020 to 27 September 2020 (inclusive) and in all likelihood ROKiT will not receive the majority of rights under the Agreement during that period. Accordingly we are not willing to make payment of the second instalment until we receive your proposals on, and agree, the way forward.

Williams has breached a number of the provisions of the Agreement and we reserve our rights in relations to such breaches. In particular:

(i) The colour scheme applied to the cars is not as agreed between the parties in Barcelona at this Season's testing, in breach of clause 3.8 of the Agreement. The signage is not the agreed size and the Team Kit, garage and all other signage do not match the car colours or our brand colours;

(ii) ROKiT has not received the majority of rights under the Agreement since cancellation of the Australian Grand Prix;

(iii) Williams has breached the confidentiality obligations in clause 15 of the Agreement by disclosing non-payment by ROKiT to Formula One World Championship Limited ("FOWC")

(iv) Williams has damaged the reputation or goodwill of ROKiT and brought the same into material disrepute in breach of clause 4.3 of the Agreement by disclosing non-payment by ROKiT to FOWC which lead to a sponsorship opportunity with FOWC being withdrawn; and

(v) Williams is in breach of the representation, undertaking and warranty in clause 5.3(a) of the Agreement.

We are surprised at your lack of any attempt to communicate or discuss proposals on the way forward and look forward to hearing from you in relation thereto as a matter of urgency. In our view the Agreement may in any event have been terminated to Frustration. ROKiT hereby reserves all rights and remedies it may have under the Agreement and in law. Nothing in this letter is or is intended to constitute a waiver of any rights that ROKiT may have."

26.     Furthermore, in response, Combine wrote

"The first instalment of the Fee in 2020 covers the period from 1st January 2020 to 14th May 2020 (inclusive). From the date of cancellation of the Australian Grand Prix ROK has not received the majority of rights under the Agreement and with the cancellation of the Monaco Grand Prix, suspension of numerous further races and the virtual certainty that additional races will be suspended or cancelled in 2020 (if the Season even goes ahead) ROK will not receive the majority of rights under the Agreement in 2020. We find it surprising that we have received no correspondence or proposals from Williams in relation to lost rights as a result of the impact of Covid 19 on Formula One, just a claim for payment and threats in relation thereto. That being said, we are willing to make payment of the first instalment of the Fee in 2020 by 15th May 2020 without prejudice to our rights and remedies under the Agreement and in law. We look forward to your proposals to compensate us for the loss of rights to date under the Agreement and moving forward as a matter of urgency.

The second instalment of the Fee in 2020 covers the period from 15th May 2020 to 27 September 2020 (inclusive) and in all likelihood ROK will not receive the majority of rights under the Agreement during that period. Accordingly we are not willing to make payment of the second instalment until we receive your proposals on, and agree, the way forward.

Williams has breached a number of the provisions of the Agreement and we reserve our rights in relations to such breaches. In particular:

(i) The colour scheme applied to the cars is not as agreed between the parties in Barcelona at this Season's testing, in breach of clause 3.8 of the Agreement. The signage is not the agreed size and the Team Kit, garage and all other signage do not match the car colours or our brand colours;

(ii) ROK has not received the majority of rights under the Agreement since cancellation of the Australian Grand Prix;

(iii) Williams has breached the confidentiality obligations in clause 15 of the Agreement by disclosing non-payment by ROK to Formula One World Championship Limited ("FOWC")

(iv) Williams has damaged the reputation or goodwill of ROK and brought the same into material disrepute in breach of clause 4.3 of the Agreement by disclosing non-payment by ROK to FOWC which lead to a sponsorship opportunity with FOWC being withdrawn; and

(v) Williams is in breach of the representation, undertaking and warranty in clause 5.3(a) of the Agreement.

We are surprised at your lack of any attempt to communicate or discuss proposals on the way forward and look forward to hearing from you in relation thereto as a

11

matter of urgency. In our view the Agreement may in any event have been terminated due to Frustration. ROK hereby reserves all rights and remedies it may have under the Agreement and in law. Nothing in this letter is or is intended to constitute a waiver of any rights that ROK may have."

27.     Ultimately, the parties were unable to resolve the issue informally, and an arbitration was held in the London Court of International Arbitration. LCIA Arbitration Case No. 204960. The arbitrator ultimately sided with Williams Engineering, but crucially, the arbitrator was not aware of the fraudulent concealment of statements of material facts by Defendants that were not discovered until after the arbitration had concluded.

28.     Importantly, Courts have the authority to vacate an arbitration award if it was procured by fraud, as is what occurred here. *France v. Bernstein*, 43 F.4th 367 (3d Cir. 2022).

29.     The three-month period in which a party has to move to vacate an arbitral award, 9 U.S.C. § 10(a) is subject to the doctrine of equitable tolling. *Nuvasive, Inc. v. Absolute Med., LLC*, 71 F.4th 861, 873 (11th Cir. 2023).

### *Facts Pertaining to Defendants' Fraud*

30.     Only very recently, on or about August 6, 2024,  after the arbitration had concluded and Williams Engineering had received a favorable decision, Plaintiff RWI has confirmed with certainty the car was never capable of performing to the standards that Defendants had guaranteed to the Plaintiff's subsidiaries, and that Defendants were aware of and fraudulently concealed this fact to the Plaintiff's subsidiaries as well as the during the arbitration process.

31.     In an August 6, 2024 article published on www.planetf1.com titled "*Claire Williams exclusive: How Williams dream turned into a nightmare before forced sale,*" Exhibit 1, Defendant Williams admits that at all material times, Williams Engineering had no money to develop a competitive F1 car:

> Costs were escalating and the technical regulations were incredibly difficult. We needed to, as any team does, spend our way out of it, but we didn't have the budget to do that. Then, going into 2018, producing the car, we didn't have the budget, and things just started getting bad from there.

32.     This very recent admission from Defendant Williams directly contradicts what Defendants told Plaintiff RWI's subsidiaries, Able Events and Combine, to induce them to enter into the Sponsorship Agreements.

33.     Furthermore, in May 2024 interview, however, Defendant Claire Williams stated "that [Williams] made mistakes from a competitive point of view as well. Not being able to produce a good car that improved year on year halted their progress massively. For context, Williams was the third fastest team in 2014 at the onset of the turbo hybrid era. They fell to be the last team in 2019."  Defendant Claire Williams went on to say that:

> [Williams] could not compete … we just couldn't keep up with that level of spending and the complexity of the technical regulations as well to try [ ] to keep spending our way out of problems.

> [We] didn't design a race car that could, you know, that improved year on year, we lagged and you that was that was our responsibility at the team.
> [W]e just ran out of money, we ran out of road.

34.     In January of 2019, the Defendants had given assurances to the opposite to the Plaintiff's subsidiaries stating that the company was all fully funded and the F1 car fully developed and fully funded. These assurances were fundamental to the Plaintiff's subsidiaries entering into the agreements to sponsor the team. In the above referenced interviews, however, Defendant Ms. Williams now admits that Defendant Williams had run out of money in 2018.

35.     It has thus been now revealed Defendant Williams was doing whatever they could to try to trick sponsors into pouring money into what was already a sinking ship. These statements and guarantees by Defendant Williams fraudulently induced Plaintiff's subsidiaries to enter into the Sponsorship Agreements with Defendant Williams, as Plaintiff would only receive

the main benefit of the Sponsorship Agreements if the F1 car bearing it logo was competitive, or at the least place in the upper side of the leaderboard. Thus, had Plaintiff and its subsidiaries known that the F1 car that would be the subject of the Sponsorship Agreements with Williams was grossly substandard and had no chance of being competitive, Plaintiff's subsidiaries would never have entered into any Sponsorship Agreements with Williams to display the "ROKiT" logo. The F1 car that was subject to the Sponsorship Agreement was the slowest car in F1 since 2019 and by such a wide margin as to be completely uncompetitive and consistently finished in the bottom half of the leaderboard and almost always in the last place. In fact, Defendant Williams was the slowest team on the grid and it was a total embarrassment and disaster for Plaintiff.

36.     Specifically, in a meeting with Defendants, prior to the execution of the Sponsorship Agreements, on or about January 18, 2019 at Williams Engineering headquarters in Grove, United Kingdon, Defendants Ms. Williams, Mr. O'Driscoll, and Mr. Lafferty made fraudulent statements and guarantees to Mr. Jonathan Kendrick, and in the presence of Mr. Bruce Renny, Mr. Chris Welsh, and other members of Able's management that claimed that the F1 car which would be subject to the Sponsorship Agreements, had industry leading performance capabilities including a Mercedes-Benz engine and would have excellent chances to be competitive, would place in the upper side of the leaderboard, and would not be slower than the 2018 Williams F1 car.

37.     Specifically, Defendants informed Combine  and Able Events that they had hired Paddy Lowe ("Mr. Lowe"), the ex-technical director of Mercedes Formula One - a legend in the industry – and that Mr. Lowe would be able to develop the F1 car to competitive standards which would be subject to the Sponsorship Agreements.

38.     This has now been directly contradicted on or about July 19, 2024 by admission in an article published in The Telegraph titled "Paddy Lowe: I worked with Mansell, Hill and Hamilton, but another driver stood out the most," <u>Exhibit A</u>, where Paddy Lowe ("Mr. Lowe"), the former Chief Technical Director at Williams Engineering disclosed the following regarding his tenure there:

> I believe they'd [Williams] made some mistakes going back a decade or even more, fundamentally in terms of the structure of the team and how it was financed….Most of these things boil down to money in the end, one way or the other. **When you analysed Williams objectively they were literally only financed to come last, so coming last was the proper result for the level of investment.** It was a question of trying to make the best of that and recover step by step. That was a very difficult period. (emphasis added). <u>Exhibit 2</u>.

39.     Thus, it has only recently been confirmed that Defendants intentionally and fraudulently concealed the fact that Williams Engineering was severely undercapitalized and simply did not have enough money to develop the F1 car which would be subject to the Sponsorship Agreements to an industry leading standard, and therefore Defendants knew that the F1 car which would be subject to the Sponsorship Agreements had no chance to be competitive, or at the least place in the upper side of the leaderboard, and actively concealed this fact from RWI's subsidiaries, Able Events and Combine, to fraudulent induce them into the Sponsorship Agreements.

40.     In fact, it has only recently been confirmed that eight individuals had been hired by Williams Engineering to be on the technical team prior to Mr. Lowe's arrival and they were promised 50 million pounds to develop viable cars. However, these eight individuals found out that there was no funding available after they joined Williams Engineering, and as a result, they all left Williams Engineering's technical team wholesale.

41.     Ultimately, these statements and guarantees by Defendants fraudulently induced Able Events and Combine to enter into the Sponsorship Agreements with Williams Engineering, as Plaintiff RWI would only receive the main benefit of the Sponsorship Agreements if the F1 car bearing the "ROKiT" logo was competitive, or at the least place in the upper side of the leaderboard.

42.     Thus, had Plaintiff known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering was grossly substandard and had no chance of being competitive, Able Events and Combine would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiff's "ROKiT" logo.

43.     Accordingly, as a direct and proximate result of the fraudulent statements made by Defendants set forth herein, Plaintiff RWI suffered a direct injury because it was fraudulently induced by the Defendants to display its "ROKiT" logo on Williams cars that were substandard and non-competitive, which severely damaged their goodwill and business reputation.

44.     As a direct and proximate result of Able Events and Combine being fraudulently induced into entering into the Sponsorship Agreements with Williams Engineering, and Williams Engineering's subsequent fraudulent claims for breach of contract that were widely publicized to the media, Plaintiff RWI suffered severe damage and harm to its goodwill and business reputation because Defendants' statements to the media created the false impression that RWI's subsidiaries, Able Events and Combine, had breached the Sponsorship Agreements.

## CAUSES OF ACTION
### Count 1 – *Fraud*
### *Defendant Williams Engineering*

45.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if set forth in full herein.

46.     On or about January 18, 2019, in Grove, United Kingdom, Defendant Williams Engineering made the following fraudulent statement of material fact: **the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard**.

47.     Defendant Williams Engineering made an omission of a material fact when it fraudulently concealed the fact that: **the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Williams Engineering had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine**.

48.     Defendant Williams Engineering  was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Williams Engineering  had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine.

49.     Defendant Williams Engineering made this false statement and false omission with the intent that the Plaintiff would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

50.     Plaintiff relied on Defendant Williams Engineering's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiff is no different.

Thus, had Plaintiff known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries, Able Events and Combine would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiff's "ROKiT" logo.

51.     As a result of the fraudulent and false statements and omissions by Defendant Williams Engineering, Plaintiff RWI's subsidiaries, Able Events and Combine, entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiff suffered severe damage both financially, as well as to its goodwill and business reputation.

## CAUSES OF ACTION
### Count 2 – *Fraud*
### *Defendant Ms. Williams*

52.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if set forth in full herein.

53.     On or about January 18, 2019, in Grove, United Kingdom, Defendant Ms. Williams made the following fraudulent statement of material fact: **the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard**.

54.     Defendant Ms. Williams made an omission of a material fact when it fraudulently concealed the fact that: **the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Ms. Williams had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine**.

55.     Defendant Ms. Williams was aware of the false nature of the statement that the F1

car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Ms. Williams had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine.

56.     Defendant Ms. Williams made this false statement and false omission with the intent that the Plaintiff would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

57.     Plaintiff relied on Defendant Ms. Williams' fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiff is no different. Thus, had Plaintiff known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries, Able Events and Combine would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiff's "ROKiT" logo.

58.     As a result of the fraudulent and false statements and omissions by Defendant Ms. Williams, Plaintiff RWI's subsidiaries, Able Events and Combine, entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiff suffered severe damage both financially, as well as to its goodwill and business reputation.

## CAUSES OF ACTION
### Count 3 – *Fraud*
### *Defendant Mr. O'Driscoll*

59.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if

set forth in full herein.

60. On or about January 18, 2019, in Grove, United Kingdom, Defendant O'Driscoll made the following fraudulent statement of material fact: **the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard**.

61. Defendant Mr. O'Driscoll made an omission of a material fact when it fraudulently concealed the fact that: **the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. O'Driscoll had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine**.

62. Defendant Mr. O'Driscoll was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. O'Driscoll had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine.

63. Defendant Mr. O'Driscoll made this false statement and false omission with the intent that the Plaintiff would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

64. Plaintiff relied on Defendant Mr. O'Driscoll's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiff is no different. Thus, had

Plaintiff known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries, Able Events and Combine would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiff's "ROKiT" logo.

65.     As a result of the fraudulent and false statements and omissions by Defendant Mr. O'Driscoll, Plaintiff RWI's subsidiaries, Able Events and Combine, entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiff suffered severe damage both financially, as well as to its goodwill and business reputation.

### CAUSES OF ACTION
### Count 4 – *Fraud*
### *Defendant Mr. Lafferty*

66.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if set forth in full herein.

67.     On or about January 18, 2019, in Grove, United Kingdom, Defendant Mr. Lafferty made the following fraudulent statement of material fact: **the F1 car which would be subject to the Sponsorship Agreements between the parties had industry leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard**.

68.     Defendant Mr. Lafferty made an omission of a material fact when it fraudulently concealed the fact that: **the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. Lafferty had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine**.

69.     Defendant Mr. Lafferty was aware of the false nature of the statement that the F1 car which would be subject to the Sponsorship Agreements between the parties had industry

leading performance capabilities and would be competitive or at least place in the upper side of the leaderboard and was also aware that that the F1 car that would be the subject of the Sponsorship Agreements between the parties was never capable of performing to the standards that Defendant Mr. Lafferty had guaranteed to the Plaintiff RWI's subsidiaries, Able Events and Combine.

70.     Defendant Mr. Lafferty made this false statement and false omission with the intent that the Plaintiff would rely on them, as Williams Engineering desperately needed a cash infusion in order to sustain operations.

71.     Plaintiff relied on Defendant Mr. Lafferty's fraudulent statements and false omissions, as it is indisputable that a car which is not competitive is clearly one that no sponsor would want to attach their name, brand, and reputation to, and Plaintiff is no different. Thus, had Plaintiff known that the F1 car that would be the subject of the Sponsorship Agreements with Williams Engineering had no chance of being competitive, Plaintiff RWI's subsidiaries, Able Events and Combine would never have entered into any Sponsorship Agreements with Williams Engineering to display Plaintiff's "ROKiT" logo.

72.     As a result of the fraudulent and false statements and omissions by Defendant Mr. Lafferty, Plaintiff RWI's subsidiaries, Able Events and Combine, entered into the Sponsorship Agreements with Williams Engineering and as a direct and proximate cause, Plaintiff suffered severe damage both financially, as well as to its goodwill and business reputation.

## CAUSE OF ACTION
### Count 5 – *Action to Set Aside Arbitration Award*

73.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if set forth in full herein.

74.     The Arbitration Award was procured through the fraudulent concealment by

Defendants of the fact that the subject car was never going to be capable of performing to the standards that Defendants had guaranteed to the Plaintiff.

75.     This fraudulent concealment was only recently discovered and confirmed by the Plaintiff, rendering this action to set aside the Arbitration Award timely under the doctrine of equitable tolling.

76.     During the arbitration before the LCIA, Plaintiff did not suspect the Defendants of fraud and had no reason to suspect this, and this was no discoverable through reasonable diligence.

77.     Only very recently, Plaintiff has uncovered a whistleblower with intricate knowledge of the Defendants' operations who has confirmed that Defendants fraudulently concealed the fact that the subject car was never going to be capable of performing to the standards that Defendants had guaranteed to the Plaintiff.

78.     The fraud was material to the case because had the Plaintiff knew this, it would never have entered into the Sponsorship Agreements with Williams Engineering. Thus, this material fraud mandates that the Arbitration Award purportedly enforcing the Sponsorship Agreements be vacated.

## CAUSE OF ACTION
### Count 6 - *Relief from a Judgment or Order Pursuant to Federal Rule of Civil Procedure 60(b)*

79.     Plaintiff realleges and incorporates the factual allegations of this Complaint as if set forth in full herein.

80.     FRCP 60(b)(3) provides relief from a judgment or order based on fraud, misrepresentation, or misconduct by an opposing party.

81.     A court has discretion to grant relief pursuant to FRCP 60(b) where it is "appropriate to accomplish justice[.]" *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949).

82.     Plaintiff has uncovered a whistleblower with intricate knowledge of the Defendants' operations who has confirmed that Defendants fraudulently concealed the fact that the subject car was never going to be capable of performing to the standards that Defendants had guaranteed to the Plaintiff.

83.     This fraud directly and proximately resulted in the LCIA Arbitration Award at issue.

84.     Thus, pursuant to Fed. R. Civ. P. 60(b), Plaintiff respectfully requests that the LCIA Arbitration Award and its domesticated judgment be set aside for fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.     Awarding Plaintiff compensatory including actual, consequential, incidental for malicious tortious concerted conduct, jointly and severally, in an amount in excess of $149,528,550 dollars or in an amount to be determined at by a jury at trial.

b.     An order setting aside the LCIA Arbitration Award based on fraud and other illegal conduct pursuant to *France v. Bernstein*, 43 F.4th 367 (3d Cir. 2022).

c.     Awarding Plaintiff punitive damages in an amount to be determined by jury.

d.     Granting such other relief as the Court deems appropriate and necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: August 23, 2024                                    Respectfully Submitted,


                                                            */s/ Larry Klayman*
                                                            Larry Klayman, Esq.
                                                            Klayman Law Group, P.A.
                                                            Florida Bar. No. 246220
                                                            7050 W. Palmetto Park Rd
                                                            Boca Raton FL 33433
                                                            Telephone: 561-558-5336

Email: leklayman@gmail.com

*Counsel for Plaintiff*